FILED

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

2021 MAR 12  PM 5:04

CLERK, US DISTRICT COURT
MIDDLE DISTRICT FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA,

      Petitioner,

v.

      Case No.: 8:21 MC 35 TPB-CPT

PHYSICIAN PARNERS OF AMERICA,
LLC, and TERRI CASEY,

      Respondents.

_____/

### PETITION TO ENFORCE A CIVIL INVESTIGATIVE DEMAND FOR TESTIMONY AND ADJUDICATE PRIVILEGE ASSERTIONS BY PHYSICIAN PARTNERS OF AMERICA, LLC

Pursuant to 31 U.S.C. § 3733(j)(1), the United States petitions the Court to enforce a Civil Investigative Demand (CID) seeking the testimony of Terri Casey, a former employee of Respondent Physician Partners of America (PPOA). The Department of Justice is investigating whether PPOA submitted false claims to federally funded healthcare programs in violation of the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, and Ms. Casey's testimony is relevant to that investigation. Although Ms. Casey is willing to testify, PPOA has instructed her not to answer certain questions on the basis of privilege.

The Court should grant the United States' petition for either of two alternative reasons. First, the information over which PPOA claims privilege is, in fact, not privileged. Second, even if the information was privileged, PPOA waived its privilege by producing documents and failing to instruct Ms. Casey not to testify about the same or similar information. Under either rationale, the CID is due to be enforced.

## JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. § 3733(j)(1).

2.      Venue is proper under 31 U.S.C. § 3733(j)(1) and 28 U.S.C. § 1391(b), because each Respondent transacts business within the Middle District of Florida.

## THE PARTIES

3.      The Petitioner is the United States of America.  The United States has statutory authority to investigate and pursue violations of the FCA.

4.      Respondent PPOA is a limited liability company organized under the laws of Delaware[1] and headquartered in Tampa.[2]  According to its website, PPOA offers pain management, orthopedics, and minimally invasive laser spine surgery, among other services.[3] As of 2018, PPOA had more than 500 employees and operated out of nearly 30 locations.  *Id.*

---

[1] *See* Fla. Dep't of State – Div. of Corps., "Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida" (July 7, 2016), http://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2016%5C0715%5C00167483.Tif&documentNumber=M16000005586  (last visited, Mar. 12, 2021).

[2] *See* Fla. Dep't of State – Div. of Corps., "Physician Partners of America, LLC," http://search.sunbiz.org/Inquiry/corporationsearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=PHYSICIANPARTNERSAMERICA%20M160000055860&aggregateId=forl-m16000005586-a4c438a7-c040-464b-ba91-0a86016d0168&searchTerm=PHYSICIAN%20OFFICE%20PARTNERS%2C%20INC.&listNameOrder=PHYSICIANOFFICEPARTNERS%20F120000037770  (last visited, Mar. 12, 2021).

[3] Physician Partners of America, "About PPOA," www.physicianpartnersofamerica.com/about-ppoa/ (last visited, Mar. 12, 2021).

5.      Respondent Terri Casey is the former "Senior Vice President, Human Resources & Compliance" at PPOA.  Ex. 1 at CID009, ¶ 3.  She is also the recipient of the CID at issue in this Petition.  Ex. 1 at CID002.

## THE FALSE CLAIMS ACT

6.      The FCA is the United States' primary tool to recover losses resulting from fraud.  *See, e.g.*, *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) (quoting *Avco Corp. v. U.S. Dep't of Justice*, 884 F.2d 621, 622 (D.C. Cir. 1989)); *see also* S. Rep. No. 99-345, at 2 (1986) (FCA is "the Government's primary litigative tool for combatting fraud").  The FCA was drafted "expansively … to reach all types of fraud, without qualification, that might result in financial loss to the Government."  *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003).

7.      The FCA imposes statutory damages and civil penalties for, among other things, knowingly submitting, or causing to be submitted, a false or fraudulent claim for payment or approval to the United States, 31 U.S.C. § 3729(a)(1)(A), or knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim, 31 U.S.C. § 3729(a)(1)(B).

8.      A person or entity's failure to comply with the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b, or the Stark Law, 42 U.S.C. § 1395nn, can serve as a basis for FCA liability.  *See, e.g.*, *United States v. Marder*, 208 F. Supp. 3d 1296, 1316 (S.D. Fla. 2016) ("Because compliance with the AKS and the Stark [Law] is a condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these statutes 'can form the basis of liability under the F[CA].'") (quoting *United States v Baycare Health Sys.*, No. 8:14-CV-73-T-EAJ, 2015 WL 4878456, at *1 (M.D. Fla. Aug. 14, 2015)); 42 U.S.C. §

1320a-7b(g) ("a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for the purposes of [the FCA]"); *cf.* 42 U.S.C. § 1395nn(g) (preventing payment of claims resulting from Stark Law violations).

9.      By law, the Department must investigate violations of the FCA.  *See* 31 U.S.C. § 3730(a).  The FCA authorizes the Department to issue CIDs for documents, information, or testimony in furtherance of such investigations.  *See* 31 U.S.C. § 3733(a)(1); *see also United States v. Witmer*, 835 F. Supp. 208, 211 (M.D. Pa. 1993) ("False Claims Act CIDs allow the Department of Justice … to compel the production of documents and the appearance of individuals for oral examination during a pre-complaint investigation of potential fraud against the government.").  The Department may issue a CID to "any person" it "has reason to believe … may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation."  31 U.S.C. § 3733(a).  The FCA permits the Government to enforce CIDs in district court.  *See* 31 U.S.C. § 3733(j)(1).

## PROCEDURAL HISTORY

**PPOA's Document Production**

10.      On June 21, 2018, the Department served a CID for documents on PPOA ("PPOA CID").  Ex. 1 at CID005-007.

11.      In November 2018, PPOA produced about 2,500 emails in response to the PPOA CID.  *See* Ex. 1 at CID090, CID109.  PPOA did not request a claw-back agreement before producing the documents.  Ex. 1 at CID109.

12.     Among the emails that PPOA produced were exchanges between Ms. Casey and other PPOA employees related to the drafting of specific contractual provisions and issues of legal compliance.[4]

13.     According to PPOA's privilege log, PPOA did not redact or withhold any email or document exchanged between Ms. Casey and other PPOA personnel on the basis of privilege.  *See* Ex. 1 at CID019.  Similarly, PPOA's privilege log does not identify any communication between Ms. Casey and any outside counsel.  *Id.*

**The Casey CID and PPOA's Privilege Assertions**

14.     On March 3, 2020, the Department served a separate CID for oral testimony on Ms. Casey ("Casey CID").  *See* Ex. 1 at CID002-003.  Ms. Casey had previously served as PPOA's "Senior Vice President, Human Resources & Compliance."[5]  Ex. 1 at CID009, ¶ 3.  In that role, Ms. Casey was charged to "render such services for the Company and its affiliates, as are customary in [her human resources and compliance] position[.]"  *Id.*

15.     In the Casey CID, the Department outlined the areas that it intended to explore at Ms. Casey's examination, including "[Ms. Casey's] knowledge of PPOA's billing practices,

---

[4] *See, e.g.*, Ex. 1 at CID021 (draft contract language), CID041 (same), CID061-067 (edits to company-wide email), CID068-070 ("Unlike the quantitative laboratory this type of laboratory (often referred to as a yes/no qualitative lab) may be owned by a medical practice."); Ex. 2 at CID201 (draft contractual language), CID203 (same), CID205 (same), CID207 (same), CID209 (same), CID211 (same), CID213 (same).  PPOA also produced draft employment contracts that were circulated for approval within PPOA.  *See, e.g.*, Ex. 1 at CID023-040 (draft Fuoco contract); CID043-060 (draft Cupido contract).

[5] Ms. Casey no longer works for PPOA, but for a company that handles outsourced human resources work.  *See* Engagement Advisors, "What We Do," www.engagementadvisors.com/what-we-do/ (last visited, Mar. 12, 2021) ("Our experts can serve as your HR advisor providing a full range of services.  …[W]e help ensure that you're doing what it takes to meet the needs of your executives and employees while ensuring compliance and minimizing risk.").

agreements with physicians, participation in recommending or reviewing compensation for services, procedures, treatments, or testing, and general familiarity with the structure and policies of PPOA and its affiliated entities." Ex. 1 at CID003.

16.     Soon after the Department served the Casey CID on Ms. Casey, PPOA raised—for the first time—a claim that Ms. Casey gave privileged legal advice during her tenure at PPOA.  On or around May 6, 2020, for example, PPOA asserted that Ms. Casey had given legal advice concerning draft employment contracts and whether contractual provisions complied with federal law.  *See* Ex. 1 at CID109.  PPOA asked to attend Ms. Casey's CID examination as a means to safeguard such information.  *Id.*

17.     Despite PPOA's claims that Ms. Casey had given privileged legal advice on employment contracts and legal compliance, PPOA did not immediately ask the Department to return any of the documents that it had previously produced, including email communications from Ms. Casey conveying the very same information that PPOA contended was privileged.  For example, PPOA did not initially request to claw back any emails between Ms. Casey and PPOA personnel that discussed draft language in physician employment contracts and compliance with federal law. Ex. 1 at CID109.  Nor did PPOA request to claw back draft employment contracts that Ms. Casey circulated to company personnel as part of internal discussions.  *Id.*

18.     The Department conferred with PPOA regarding its new privilege assertion. Ex. 1 at CID109.  On July 2, 2020, for example, the Department asked PPOA to explain why Ms. Casey's involvement in the drafting of employment contracts would have constituted privileged legal advice, as opposed to the sort of non-legal advice customarily provided by human resources professionals.  Ex. 1 at CID072-073.  The Department asked PPOA to "be

as specific as possible" in describing the circumstances in which Ms. Casey provided legal advice, by identifying the particular matters on which she worked as an attorney and the particular individuals with whom she interfaced on each matter.  Ex. 1 at CID073.

19.     PPOA failed to provide the information that the Department had requested. Instead, on July 14, 2020, PPOA made a blanket assertion of privilege, contending that Ms. Casey had generally given privileged legal advice because she had a law license during the time she worked at PPOA.  Ex. 1 at CID074.  In addition, PPOA broadly claimed that Ms. Casey had fielded (unspecified) healthcare compliance questions that "necessarily involved the review and interpretation of laws and regulations," including (unspecified) questions from (unspecified) new hires about (unspecified) physician contracts.  Ex. 1 at CID074-075.

20.     On July 17, 2020, the Department responded to PPOA's blanket assertions by once again asking PPOA to identify the particular matters on which Ms. Casey provided legal advice and the particular individuals to whom she provided it.  Ex. 1 at CID076.  The Department further noted in its letter that PPOA had previously produced documents containing *the very same information* over which it now asserted privilege.  Ex. 1 at CID078.  In addition, the Department noted that when Ms. Casey left PPOA, PPOA had hired a non-attorney human resource professional to give the very same sort of "legal compliance" guidance that PPOA claimed was privileged when given by Ms. Casey.  Ex. 1 at CID077; *see also* Ex. 1 at CID106 (official biography of Crystal Winkler, a non-attorney who led PPOA's human resource department after Ms. Casey's departure, stating that she handled "all areas of HR including ... *legal compliance* ... [and] *compensation*") (emphasis added).  In its response, PPOA continued to rely on blanket assertions of privilege.  *See, e.g.*, Ex. 1 at CID082.

7

**PPOA's Delinquent Claw-Back Requests**

21.     On July 28, 2020—almost *two years* after PPOA had produced emails and other documents pursuant to the PPOA CID, and *several months* after first claiming that Ms. Casey had provided privileged legal advice—PPOA sent a letter requesting to claw back one document from its productions under the PPOA CID.  Specifically, PPOA sought to claw back "an email chain, in which Terri Casey modifie[d] the legal language of a PPOA employment contract provision."  Ex. 1 at CID082.  PPOA claimed that this document reflected "the giving of legal advice by Ms. Casey to PPOA."  *Id.*  PPOA did not identify the purportedly privileged document by Bates-number or provide an updated privilege log.  Instead, PPOA attached the document as an exhibit to its letter to the Government, thereby forcing the Government to read the purportedly privileged document to respond to PPOA's request.  *See* Ex. 2 at CID201-202.

22.     Upon receiving PPOA's delinquent claw-back request, the Department asked PPOA to confirm that "there [we]re no additional documents that PPOA wishe[d] to claw back on the basis of the attorney-client privilege or work-product protection."  Ex. 1 at CID084.

23.     On August 24, 2020, PPOA responded by requesting to claw back six additional documents.  Ex. 1 at CID086.

24.     To evaluate the merits of PPOA's claw-back requests, including whether there had been a waiver, the Department sought additional information about "what steps, if any, PPOA took to protect against the production of allegedly privileged documents in response to the Department's [PPOA CID]" and the legal basis for PPOA's requests.  Ex. 1 at CID087.

25.     In its response, PPOA explained that the only steps it had taken to prevent the production of privileged documents under the PPOA CID was to review emails "for any communication with outside counsel."  Ex. 1 at CID090.  In other words, PPOA apparently did not identify Ms. Casey as an attorney or review her emails for privilege before producing them.  *Id.*  PPOA further confirmed that it did not intend to assert privilege over any documents other than the one document identified in its July 28 letter and the six additional documents identified in its August 24 letter.  *Id.*

26.     By letter dated November 30, 2020, the Department denied PPOA's claw-back requests.  Ex. 1 at CID092-094.

**Examination Questions, Instructions, and Acceptance of Instructions**

27.     After denying PPOA's claw-back requests, the Department suggested two options for resolving the parties' dispute regarding Ms. Casey's pending CID testimony, given that PPOA's counsel did not represent Ms. Casey and would not be present at her examination.  First, the Department offered to allow time for PPOA to file a miscellaneous action to limit the topics that the Department discussed at Ms. Casey's CID examination and the documents on which the Department questioned Ms. Casey.   Second, and in the alternative, the Department offered to circulate a non-exhaustive list of written examination questions—to both Ms. Casey and PPOA—before Ms. Casey sat for oral testimony.  These questions would capture the subject matter of PPOA's claimed privilege, so that PPOA could give representative privilege instructions and the Department could petition the Court to resolve them. Ex. 1 at CID094.  By doing this, the Department could avoid wasting the time and resources of having to schedule a CID examination, only to have Ms. Casey's attorney give privilege instructions based on PPOA's assertions, and then be forced to schedule the

examination all over again if the Court decided in the Government's favor.[6]  PPOA accepted the Department's offer to provide examination questions and then lodge written objections. Ex. 1 at CID095.

28.    On January 13, 2021, the Department provided to Ms. Casey and PPOA a non-exhaustive list of written questions.  Ex. 1 at CID097-100.  These questions required Ms. Casey to testify about:

- the circumstances of her retention as Senior Vice President of Human Resources and Compliance (Questions 1-2);

- discussions with other PPOA employees about physician employment contracts (Questions 3-9);

- emails that Ms. Casey sent to other PPOA employees about draft employment contracts that PPOA had not sought to claw back (Questions 10-11);

- an email that Ms. Casey sent to other PPOA employees about a draft employment contract that PPOA had sought to claw back (Question 12);

- discussions about other contracts and contractual provisions (Questions 13-14); and

- Ms. Casey's views on PPOA's compliance with various laws and regulations, including the Stark Law, as related to PPOA's employment contracts (Questions 15-18).

Ex. 1 at CID097-100.

29.    On January 19, 2021, PPOA instructed Ms. Casey not to answer certain of the Department's written questions—concerning "employment contracts and related issues"—on the basis of attorney-client privilege.  Ex. 1 at CID101.  However, PPOA did *not* instruct Ms. Casey to withhold answers to all of the Department's questions related to contractual

---

[6] This would also avoid a situation in which Ms. Casey's counsel endeavored give good faith privilege instructions on PPOA's behalf, but was unfamiliar with the contours of PPOA's assertions.

modifications or legal compliance.  For example, PPOA failed to instruct Ms. Casey not to answer questions requiring her to testify about draft contractual language and documents that PPOA contended were privileged.  *See, e.g.*, Ex. 1 at CID099 (Question 12a) ("Why did you propose to change the language reflected here?") (discussing a document over which PPOA asserted privilege).   PPOA also failed to instruct Ms. Casey not to answer a question requesting her views on PPOA's compliance with the Stark Law:

> Do you recall any instances, based solely on your opinion as a human resources professional with responsibility over employment contracts (not on any conversations with PPOA's outside counsel), where you felt that PPOA's employment contracts failed to comply with the Stark Law?

Ex. 1 at CID100 (Question 18), CID101 (PPOA objections to Questions 18a and 18b only).

30.    On January 21, 2021, Ms. Casey's attorney confirmed that Ms. Casey would accept PPOA's privilege instructions.  Ex. 1 at CID103.

## <u>MEMORANDUM OF LAW IN SUPPORT OF PETITION</u>

### I.    **The PPOA and Casey CIDs Were Properly Issued**

Federal agencies possess an almost unfettered power of original inquiry, which they often exercise through the issuance of administrative subpoenas.  *See, e.g.*, *United States v. Fla. Azalea Specialists*, 19 F.3d 620, 622-23 (11th Cir. 1994) (noting that administrative agencies have "a power of inquisition … analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not") (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) ("*Morton Salt*")).

"[T]he role of a district court in a proceeding to enforce an administrative subpoena is sharply limited[.]"  *Fla. Azalea Specialists*, 19 F.3d at 623; *see also FTC v. Texaco, Inc.*, 555 F.2d

862, 871-72 (D.C. Cir. 1977).  Indeed, the Eleventh Circuit follows the seminal standard first articulated by the Supreme Court in *Morton Salt*, 338 U.S. at 652, which provides that "an administrative subpoena should be enforced 'if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.'" *Fla. Azalea Specialists*, 19 F.3d at 623 (citations omitted); *see also United States ex rel. Silva v. VIVI Marketing, LLC*, No. 8:15-cv-444-T-33TGW, 2020 WL 1677335, at *2 (M.D. Fla. Apr. 6, 2020) (same); *cf. In re McVane*, 44 F.3d 1127, 1135 (2d Cir. 1995) (noting that the *Morton Salt* standard, "with minor linguistic variations, has become the accepted test for judicial enforcement of administrative subpoenas") (citations omitted).

CIDs for testimony under the FCA are enforced as administrative subpoenas.  *See, e.g.*, *United States v. Picetti*, No. 2:19-cv-00049, 2019 WL 1895057, at *2 (E.D. Cal. Apr. 29, 2019) (finding that "CIDs are enforced as administrative subpoenas"); *United States v. Markwood*, 48 F.3d 969, 976 (6th Cir. 1995) (same); *Silva*, 2020 WL 1677335, at *2 (same).  In enforcing FCA CIDs, courts employ derivations of the *Morton Salt* standard.  *See, e.g.*, *Picetti*, 2019 WL 1895057, at *2 (framing standard as whether Congress granted authority to investigate, the proper procedural requirements were followed, and whether the evidence is relevant and material to the investigation); *Markwood*, 48 F.3d 969, 976, 980 (6th Cir. 1995) (finding that "the requirement for definiteness for production of documents" did not make sense in the context of a CID for testimony).

Here, the Department clearly satisfies the minimal criteria for enforcement.  For example, no party has ever contested that the subject matter of Ms. Casey's pending examination, including PPOA's hiring and compensation of physicians, is within the authority of the Department to investigate.  *Cf. Picetti*, 2019 WL 1895057, at *4 (finding that

the submission of false claims, and potential violations of the AKS and Stark Law, are within the Department's authority to investigate). Nor does any party contest that the FCA expressly authorizes the Department to obtain this information through CID testimony. *Cf.* 31 U.S.C. § 3733(a)(1)(C) ("the Attorney General may … issue in writing a civil investigative demand requiring such person … to give oral testimony concerning such documentary material or information" that was produced).

Similarly, the Department's anticipated inquiry under the Casey CID is reasonably relevant, which, in the context of an investigation, requires only that the CID is "'not plainly incompetent or irrelevant to any lawful purpose' of the agency." *Cf. E.E.O.C. v. Kloster Cruise, Ltd.*, 939 F.2d 920, 922-23 (11th Cir. 1991) (citations omitted); *see also Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943); *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1113-14 (9th Cir. 2012) ("Relevancy is determined in terms of the investigation rather than in terms of evidentiary evidence. …The information subpoenaed need only be relevant to the agency investigation."). The Department is investigating whether PPOA submitted false claims to federal healthcare programs that were tainted by financial transactions that violated the AKS and Stark Law. Testimony about how physicians were hired and compensated, and what individuals at PPOA knew about both, falls squarely within the responsible discharge of the Department's statutory duty to investigate these allegations.[7]

---

[7] The third *Morton Salt* requirement, that requests not be indefinite, applies only to CIDs seeking the production documents, not to CIDs seeking oral testimony. *See, e.g.*, *Markwood*, 48 F.3d at 980 (finding that because "Markwood is now only resisting the United States' ability to retain information from his oral deposition ... we need not determine whether the United States' demand met the requirement of definiteness for production of documents"); 31 U.S.C. § 3733(a)(2)(B)(i) (providing that only "[i]f the demand is for the production of documentary material," the Department shall describe the class of material to be produced "with such *definiteness* and certainty as to permit such material to be fairly identified") (emphasis added). That notwithstanding, the United States has previously

No party has alleged that the Casey CID was improperly authorized or served, much less filed a petition to modify the CID or set it aside. *Cf.* 31 U.S.C. § 3733(j)(2)(A). In fact, Ms. Casey is willing to testify. As a result, the only basis on which PPOA can preclude an order granting the Petition—and compelling Ms. Casey to answer questions about contract modifications, employee hiring and compensation, and legal compliance issues related to both—is by establishing that PPOA has a valid and applicable claim of privilege over that information.

## II.   PPOA's Attorney-Client Privilege Assertions are Meritless

This Court should enforce the Casey CID over PPOA's assertions for two reasons. *First*, PPOA has not met its burden to establish that the information it seeks to protect—Ms. Casey's involvement in "the modification of pertinent terms in PPOA employment contracts for medical providers" (Ex. 1 at CID082)—is privileged. *Second*, even if that information was privileged, PPOA waived its privilege by producing documents and failing to instruct Ms. Casey not to answer questions concerning the same information.

### A.   PPOA Has Failed to Establish a Privilege Over the Information

"The federal law of privilege applies to all claims in a federal question case." *Knights Armament Co. v. Optical Sys. Tech., Inc.*, No. 2009 WL 331608, at *2 (M.D. Fla. Feb. 10, 2009) (citing *Hancock v. Hobbs*, 967 F.2d 462, 467 (11th Cir. 1992)); *see also* Fed. R. Evid. 501. Federal law therefore governs privilege assertions in FCA cases, which arise from federal statute. *See, e.g.*, *United States v. HCA Holdings Inc.*, No. 12-cv-20638, 2015 WL 11198933, at

---

specified that it seeks Ms. Casey's testimony on issues including "PPOA's billing practices, agreements with physicians, participation in recommending or reviewing compensation for services, procedures, treatments, or testing, and general familiarity with the structure and policies of PPOA and its affiliated entities." Ex. 1 at CID003.

*3 (S.D. Fla. July 21, 2015) (finding that, in an FCA case, "t[he] Court's jurisdiction is based on a federal question; thus, federal common law governs [any] privilege dispute"); *cf.* 31 U.S.C. § 3733(j)(1) (giving district courts the power to adjudicate FCA CID proceedings).

Under federal law, the attorney-client privilege is construed "narrowly." *United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987); *see also Fisher v. United States*, 425 U.S. 391, 403 (1976) ("[S]ince the privilege has the effect of withholding relevant information from the fact finder, it applies only where necessary to achieve its purpose.").  In the context of federal investigations, in particular, "courts have indicated that the privilege should be granted cautiously," *Equal Employment Opportunity Comm'n*, 876 F.3d 690, 695-96 (5th Cir. 2017) (citations omitted), "given the 'congressional policy choice *in favor of disclosure* of all information relevant to a legitimate [federal] inquiry,'" *Cavallaro v. United States*, 284 F.3d 236, 245-46 (1st Cir. 2002) (quoting *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984) (emphasis in original)).

The burden to establish the attorney-client privilege falls squarely upon the proponent of the privilege, which must show "that an attorney-client relationship existed and that the particular communications were confidential."  *United States v. Schaltenbrand*, 930 F.2d 1554, 1562 (11th Cir. 1962).  This showing must generally include proof that:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [the] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and (d) not for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Knights Armament Co.*, 2009 WL 331608, at *2 (citing *In re Grand Jury Proceedings 88-9(MIA)*, 899 F.2d 1039, 1042 (11th Cir. 1990)).

The party asserting privilege bears the "heavy burden" of meeting each of these elements. *In re Grand Jury Subpoenas Dated Mar. 19, 2002 and Aug. 2, 2002*, 318 F.3d 379, 384 (2d Cir. 2003) (quoting *United States v. Nixon*, 418 U.S. 683, 710 (1974)). This heavy burden cannot be met through "conclusory" declarations "simply describing a lawyer's advice as 'legal.'" *Equal Employment Opportunity Comm'n*, 876 F.3d 690, 695-96 (5th Cir. 2017) (citing *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) ("Calling the lawyer's advice 'legal' or 'business' advice does not help in reaching a conclusion; it *is* the conclusion.")). To the contrary, the Court's inquiry into whether the proponent has met this burden is "highly fact-specific." *Stoffels v. SBC Comm'ns, Inc.*, 263 F.R.D. 406, 411 (W.D. Tex. 2009) (citing *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir. 1978)). If the asserting party has not proven each element in light of the facts, or the factual record is ambiguous as to any element, then the asserting party has not established the privilege. *See, e.g.*, *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473-74 (2d Cir. 1996) (rejecting attorney-client and work product claims where party failed to establish elements); *Heublein, Inc. v. E&J Gallo Winery, Inc.*, No. 94-cv-8155, 1995 WL 645438, at *2 (S.D.N.Y. Nov. 1, 1995) ("The burden of sustaining a claim of privilege is on Heublein. Because the record is ambiguous, Heublein has not sustained its burden.") (citations omitted).

Here, PPOA has unquestionably *failed to meet its burden* to establish that the information about which the United States intends to question Ms. Casey is subject to the attorney-client privilege. Instead, the overwhelming evidence shows that no privilege exists—

or, at minimum, that there is substantial ambiguity as to the elements that PPOA is required to prove.

According to PPOA's own employment agreement with Ms. Casey, for example, Ms. Casey was employed exclusively as a human resources professional and charged to perform work that was "customary" in her position as such.  Ex. 1 at CID009, ¶ 3.  During her tenure at PPOA, Ms. Casey reported to PPOA's Chief Financial Officer (CFO), not to any legal officer or general counsel.  *See id.*  The CFO knew that Ms. Casey was employed as a human resources professional because she signed Ms. Casey's employment agreement.  *See* Ex. 1 at CID018.  In a company-wide email, Ms. Casey was introduced as "Senior Vice President for Compliance and Human Resources" (not as an attorney), and her role was described as "overseeing [PPOA's] compliance efforts" and "working with our managers and employees to help make Physician Partners of America an even better place to work."  Ex. 1 at CID068-069.  The signature block of Ms. Casey's internal emails to PPOA employees bore the title "SVP HR & Compliance."  *E.g.*, Ex. 1 at CID041; Ex. 2 at CID202.  And when Ms. Casey left PPOA, PPOA hired a non-attorney human resource professional to give the very same sort of "legal compliance" guidance that PPOA claimed was privileged when Ms. Casey gave it.  Ex. 1 at CID077-078; *see also* Ex. 1 at CID106 (official biography of Crystal Winkler, a non-attorney who led PPOA's human resource department after Ms. Casey's departure, stating that she handled "all areas of HR including … *legal compliance* … [and] *compensation*") (emphasis added).

Consistent with her non-attorney role at PPOA, the overwhelming evidence further shows that Ms. Casey did not act as a lawyer or communicate with PPOA employees to provide legal opinions or give legal advice.  Not only has PPOA failed to identify any

communications involving Ms. Casey on its privilege log (either with outside counsel or with internal PPOA employees),[8] but the documents that PPOA produced reflect that Ms. Casey acted as a human resources employee who fulfilled a customary human resources roles related to hiring, compensation, and the employee-employer relationship. *See, e.g.*, *Koumoulis v. Indep. Fin. Mtkg. Grp., Inc.*, 295 F.R.D. 28, 45 (E.D.N.Y. 2013) ("A primary purpose of a company's human resources program is to ensure compliance with the myriad of laws regulating employer-employee relations, such as the laws raised in this case… Despite its legal content, human resources work, like other business activities with a regulatory flavor, is part of the day-to-day operations of a business; it is not a privileged activity."); *see also Farnham v. Riimic, LLC*, No. 12-60153-CIV, 2012 WL 5187851, at *1 (S.D. Fla. Oct. 19, 2012) ("As HR Manager, Farnham's duties included … on-boarding of new employees … and researching OSHA regulations and employee classifications under the Fair Labor Standards Act *to ensure [the company's] compliance with those laws.*") (emphasis added). Just because Ms. Casey performed this customary human resources function against the backdrop of laws and regulations—which any human resources professional in her position, regardless of whether they have a law degree, would be tasked to know—does not mean that she provided "legal advice."[9] And, indeed, PPOA has produced no evidence, as the law requires, that it sought

---

[8] *See, e.g.*, *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, No. 96-cv-2064, 1996 WL 668862, at *4 (S.D.N.Y. Nov. 19, 1996) ("Plaintiffs did not take the basis precaution of listing [any of Ms. Casey's documents] on a privilege log.") (citing *Baron Philippe de Rothschild v. Paramount Distillers, Inc.*, No. 87-cv-6820, 1995 WL 86476, at *1 (S.D.N.Y. Mar. 1, 1995)).

[9] Even if Ms. Casey *had* served as an attorney at PPOA, which she did not, it is unlikely that her communications on the issues here would be subject to privilege. Not only is there no presumption of privilege for communications with inside counsel, *see, e.g.*, *United States v. Davita, Inc.*, 301 F.R.D. 676, 682 (N.D. Ga. 2014), but inside counsel often give business advice that "gives rise to no privilege whatsoever," *Colton v. United States*, 306 F.2d 633, 638 (2d Cir. 1962); *see also Adams & Assocs., Inc. v. Nat'l Labor Relations Bd.*, 871 F.3d 358, 370 n.3

18

any sort of opinion from Ms. Casey that would have required her to opine primarily as an attorney, rather than as a human resources professional.

While PPOA conjectures that the guidance Ms. Casey provided somehow "exceeded the standard human resources function," Ex. 1 at CID086, it fails to explain how.  And, in fact, the areas that PPOA does identify, including the modification of contract terms for legal compliance, were tasks that were also handled by non-attorney human resource personnel at PPOA.  *See, e.g.*, Ex. 1 at CID106 (PPOA website biograph of Crystal Winkler, noting that she worked on issues of "legal compliance."); Ex. 1 at CID022 (email from Don Haight proposing draft language).[10]  Certainly, "[Ms. Casey's] status as an attorney does not transform what would otherwise be human resources and business communications into legal communications."  *Koumoulis*, 295 F.R.D. at 45.  Nor does the fact that PPOA may have placed more stock in Ms. Casey's opinion, by virtue of her law degree, transform her human resources opinion into one of law.

Indeed, perhaps the most telling evidence that Ms. Casey did not have an attorney-client relationship with PPOA, through which she provided legal advice, is that PPOA did not think to review Ms. Casey's emails before producing them.  *See supra* ¶ 25.  It was only

---

(5th Cir. 2017) (finding that even when a licensed attorney "ha[d] a dual role as … senior HR executive and General Counsel," which Ms. Casey did not, information "pertain[ing] principally to human resources and labor relations" did not qualify as legal advice).  Such business advice would naturally extend to the on-boarding and compensation of physicians in the normal course of business.

[10] Presumably realizing that Ms. Casey's work was similar to the work of other human resources personnel, PPOA attempts to minimize the role of those other employees by suggesting that guidance they provide is limited to things like "whether a person deserved a signing bonus."  Ex. 1 at CID085.  This self-serving portrayal was contradicted by PPOA's own website, which, again, noted that non-attorney human resources personnel handled issues of "legal compliance."  Ex. 1 at CID106.

when the Department sought to interview Ms. Casey that PPOA first asserted that she had acted as an attorney.  Put simply, there is no factual record—much less an unambiguous one—sufficient to find that PPOA has carried its burden to establish privilege over the information at issue.

### B.    PPOA Has Waived Any Privilege Claim

Even assuming, *arguendo*, that Ms. Casey's communications with PPOA personnel were privileged when they occurred, there can be no genuine dispute that PPOA waived this privilege by producing to the United States documents containing the same or similar information, *see supra* ¶ 12, and by failing to object to written examination questions calling for the same or similar information, *see supra* ¶ 29.  This waiver applies to both the documents that PPOA produced and the subject matter at issue in Ms. Casey's oral CID examination.

### 1.    PPOA's Disclosures Effected a Waiver

PPOA's production operates as a waiver as to the information disclosed if its production was not inadvertent, *or* it failed to take reasonable steps to prevent disclosure, *or* it failed to promptly take reasonable steps to rectify the disclosure. Fed. R. Evid. 502(b); *see also Walker v. GEICO Indem. Co.*, No. 6:15-cv-1002, 2016 WL 11578803, at *6 (M.D. Fla. July 11, 2016).  As "[t]he disclosing party," PPOA "bears the burden of proving that the elements of Rule 502(b) have been met." *Walker*, 2016 WL 11578803, at *6.  PPOA cannot plausibly meet this burden, as none of Rule 502(b) factors weighs in its favor here.

*First*, PPOA's production was not inadvertent.  Even though it now claims that Ms. Casey provided legal advice, for example, PPOA deliberately produced communications between Ms. Casey and others at PPOA without reviewing them for privilege. *See supra* ¶ 25; Ex. 1 at CID090.  Such productions qualify as advertent. *See, e.g.*, *JAWHBS, LLC v. Arevalo*,

224 F. Supp. 3d 1296, 1301 (S.D. Fla. 2016) (advertence when attorney identified particular classes or types documents, and then produced them); *Callan v. Christian Audigier, Inc.*, 263 F.R.D. 564, 566 (C.D. Cal. 2009) ("[D]efendants [did not show that they] reviewed the allegedly privileged documents before producing them to plaintiff or what precautions they took to prevent disclosure of [the] allegedly privilege documents to plaintiff; thus, defendants have not shown their production of any document was 'inadvertent.'") (citations omitted).

PPOA does not deny that it knew exactly what it produced in November 2018, including internal emails from Ms. Casey.  Nor does PPOA contest that it produced those sorts of documents on purpose.  Instead, PPOA's only defense is that it did not realize that the information was subject to a claim of privilege at the time it was advertently produced. *See* Ex. 1 at CID090-091 (noting that, after producing Ms. Casey's emails, "our understanding of the facts broadened, and we asserted privilege").  In other words, it is not that PPOA produced the documents *inadvertently*, but that PPOA failed to perform the due diligence required to know that the documents it had *advertently* produced were potentially subject to a claim of privilege.  While this argument should put to bed any suggestion that PPOA exercised reasonable diligence to protect its privilege, as discussed below, it has no bearing on the advertence of PPOA's productions.  An "advertent" production does not transform into an "inadvertent" one because the producing party could not decide which privileges to assert before putting documents in the mail.

PPOA's instructions to Ms. Casey not to answer certain examination questions only underscore the advertence of its document disclosures.  Even though PPOA asserted privilege over certain documents, for example, it failed to instruct Ms. Casey not to answer questions that would have required her to opine on those very documents.  *See supra* ¶ 29.  In addition,

PPOA failed to instruct Ms. Casey not to answer a question that expressly required her to elaborate on whether she "felt that PPOA's employment contracts failed to comply with the Stark Law[.]"  *Id.* (quoting CID100).  PPOA cannot hold its tongue when Ms. Casey is asked to opine on written communications or legal compliance matters over which PPOA asserts privilege and still retain a colorable privilege over this information.

**Second**, for similar reasons, PPOA can hardly have been said to have taken reasonable steps to prevent disclosure.  For example, PPOA did not seek a claw-back agreement before producing the documents.  *See, e.g.*, *Sec. & Exch. Comm'n v. Badian*, No. 06-cv-2621, 2009 WL 222783, at *3 (S.D.N.Y. Jan. 26, 2009) ("I have been shown no evidence that Rhino or Bryan Cave LLP took any precautions to weed out potentially privileged documents.... [Respondent did] not engag[e] in any debate about privilege, let alone ask[] the SEC to commit to a 'claw-back' agreement.").[11]  Then, despite not having any applicable claw-back protection in place and knowing that Ms. Casey's emails were among the documents produced, PPOA declined to review the contents of those communications for the very privilege that it would later assert.[12]  This is sufficient for a waiver.  *See The Navajo Nation v.*

---

[11] A claw-back could have conceivably provided PPOA with some measure of assurance when it failed to conduct a comprehensive privilege review.  *Cf.* Rule 502(d) advisory comm. notes (citing *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 290 (S.D.N.Y. 2003), for the proposition that claw-back agreements can limit privilege reviews).

[12] PPOA's failure to review these emails is particularly egregious, not only in light of its subsequent privilege assertions over the emails, but the fact that at the bottom of her emails, Ms. Casey included stock language stating that each email was covered by the Electronic Communications Privacy Act and "may be protected under the Attorney/Client privilege." *See, e.g.*, Ex. 1 at CID042; Ex. 2 at CID202.  While the inclusion of this language obviously does not transform Ms. Casey's human resources advice into legal advice, particularly since PPOA has not even asserted privilege over some of the emails in which the stock language appears (*e.g.*, Ex. 1 at CID042), it nevertheless eviscerates any suggestion that PPOA reviewed the emails with any degree of care—much less took reasonable steps to protect the privileges

*Peabody Holding Co.*, 255 F.R.D. 37, 46 (D.D.C. 2009) ("Had the Navajo reviewed these productions … the[y] would have known that the Hopi inadvertently provided Defendants with the Navajo's privileged documents.  This knowing, self-inflicted blindness is further evidence that the Navajo failed to treat its privileged material like 'crown jewels.'") (citations omitted).  PPOA failed to do this even though the volume of produced emails was comparatively small, and even though PPOA was permitted a generous amount of time—five months after receiving the CID—to make its productions.  These factors are also sufficient for a waiver.  *See, e.g.*, *Ciba-Geigy Corp. v. Sandoz Ltd.*, 916 F. Supp. 404, 413 (D.N.J. 1995) ("[T]he Court finds that counsel failed to establish that it undertook reasonable steps to prevent the inadvertent disclosure of the … document, given the small size of the production at issue, the lack of time constraints, and counsel's inexcusable neglect, on two occasions, to conduct a privilege review prior to production.").

On top of that, despite being presented with written questions that the Department planned to ask Ms. Casey at her CID examination, and having several days to read and digest those questions, and then assert privilege instructions in response to them, PPOA failed to instruct Ms. Casey not to answer questions requiring her to opine on ostensibly privileged language reflected in a document that PPOA had requested to claw back, in addition to her views on whether PPOA was compliant with the Stark Law.  *See supra* ¶ 29.  This failure to object, under the circumstances and in the height of a privilege dispute, can hardly be characterized as a reasonable step to avoid disclosure.

---

it would later assert.  Had PPOA simply searched its productions for the word "privilege," for example, it would have uncovered these documents.

*Third*, PPOA failed to promptly rectify the issue.  To the contrary, *nearly two years* elapsed before PPOA sought to claw back any documents related to Ms. Casey—a time period that is itself sufficient to demonstrate a lack of reasonable promptness.  *See Navajo Nation*, 255 F.R.D. at 46 ("[T]he Navajo waited *two years* after [disclosure] … before bringing a Motion for Protective Order.") (emphasis added).  This is despite the fact that, during this time, PPOA was notified that the Department intended to depose Ms. Casey.  And yet, months passed before PPOA went back and reviewed any of her produced emails.  Indeed, PPOA did not appear to review those emails until *the Department* mentioned their production in a letter to PPOA.  *See* Ex. 1 at CID078, CID093.  And even then, PPOA waited until August 24, 2020, *more than five weeks later*, before requesting to claw back six of the seven documents at issue, despite the fact that the documents should have been easily searchable by Ms. Casey's name. *See, e.g., Badian*, 2009 WL 222783, at *6 (finding that even waiting "12 days" was careless); *see also LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.*, No. 04-cv-5452, 2007 WL 2324292, at *5 (S.D.N.Y. Aug. 13, 2007) (privileged waived where counsel objected to email as privileged during deposition, but waited one month to ask for its return); *Liz Claiborne, Inc.*, 1996 WL 668862, at *5  (privileged waived where party waited one month after disclosure to request return of document).

PPOA appeared to dismiss the delay in clawing back the six additional documents on the basis that those documents were simply additional copies or variations of the document that PPOA had initially requested to claw-back on July 28.  Ex. 1 at CID086.  This is not entirely accurate, as several of the documents that PPOA sought to claw back on August 24 contained additional communications not reflected in the July 28 document.  *Compare, e.g.*, Ex. 2 at CID201, *with* Ex. 2 at CID211.  In addition, language similar to that reflected in the

six documents also appears in other documents that PPOA did *not* request to claw back. *Compare, e.g.*, Ex. 2 at CID203, *with* Ex. 1 at CID021. And attached to some of the documents that PPOA failed to claw back were draft employment contracts that were *not* attached to the documents that PPOA had requested to claw back. *See, e.g.*, Ex. 1 at CID021, CID041. It is well-established that such selective disclosures—and, by extension, selective claw-back requests—are insufficient to protect an asserted privilege. *See, e.g.*, *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 (5th Cir. 1999) (defendant "waived the attorney-client privilege by selectively disclosing confidential communications") (cited in the Rule 502 advisory comm. notes); *Int'l Tel. & Tel. Corp. v. United Tel. Co. of Fla.*, 60 F.R.D. 177, 185 (M.D. Fla. 1973) (noting that "a party may not insist upon protection of the privilege for damaging communications while disclosing other selected communications").

Finally, after failing to act promptly in clawing documents back, PPOA refused to object to examination questions asking Ms. Casey to opine on certain of the documents. This, too, was unreasonable, particularly since PPOA had several days to ruminate on the Department's written questions before lodging its written objections. *See, e.g.*, *Luna Gaming-San Diego, LLC v. Dorsey & Whitney, LLP*, 06-cv-2804, 2010 WL 275083, at *5 (S.D. Cal. Jan. 13, 2010) ("[I]f a privileged document is used at a deposition, and *the privilege holder fails to object immediately*, the privilege is waived. …Failing to stop responses to questions at a deposition also waives the privilege.") (citations omitted and emphasis added).

There is, quite simply, no doubt that PPOA's conduct effected a waiver. While PPOA must prove that all of the Rule 502(b) factors supports its privilege, the uncontroverted record shows that *each factor* instead weighs in favor of the United States. The United States contends that this waiver clearly extends to all of the documents and information that PPOA disclosed

25

and failed to instruct Ms. Casey not to provide—even assuming, *arguendo*, that the information was privileged in the first instance.

### 2.    The Scope of the Waiver Extends to All Other Material at Issue

Just as there is little doubt that PPOA's conduct effected a waiver over Ms. Casey's communications with other PPOA employees regarding contract modifications, including the seven documents it now seeks to claw back, there is little doubt that the scope of its waiver extends to the entire subject matter at issue in the Department's proposed CID examination of Ms. Casey.   Under the Federal Rules, a waiver over disclosed information extends to undisclosed information if the waiver is intentional, the disclosed and undisclosed information concerns the same subject matter, and the material ought in fairness be considered together.  Fed. R. Evid. 502(a).  Each of these factors weight against PPOA here.

*First*, and for the reasons mentioned in Part II.B.1 above, PPOA's waiver was intentional.  Not only did PPOA purposely produce documents from Ms. Casey—reflecting guidance that she communicated about contract modifications, physician compensation, and issues of legal compliance related to both—PPOA also failed to object to written examination questions that required Ms. Casey to opine on purportedly privileged documents, in addition to her views on PPOA's compliance with the Stark Law.  *See supra* ¶¶ 25, 29.  By doing this, PPOA intentionally forfeited its privilege over the information that Ms. Casey had been asked to provide.  *See United States v. Gurtner*, 474 F.2d 297, 299 (9th Cir. 1973) ("[T]he failure to assert the privilege when the evidence is first presented constituted a *voluntary waiver* of right.") (emphasis added); *Luna Gaming-San Diego, LLC*, 2010 WL 275083, at *5 (finding that "the failure to specifically object to the document and permit questioning regarding its substance

waived the privilege"); *see also United States v. Swann*, 486 F.3d 260, 265 (7th Cir. 2007) ("[T]he privilege is forfeited if the party fails to make a timely objection at trial.").

This intentional nature of PPOA's waiver is significant.  PPOA cannot deliberately produce written communications between Ms. Casey and other PPOA employees, and then permit the Department to question Ms. Casey about certain aspects of communications over which it asserts privilege, without placing at issue other aspects of those communications that it withheld. *See, e.g.*, *Mohawk Indus., Inc. v. Interface, Inc.*, No. 4:07-cv-0212, 2008 WL 5210386, at *12 (N.D. Ga. Sept. 29, 2008) (finding that "a waiver of the attorney-client privilege occurs when a party … *testifies as to [privileged] communications*") (emphasis added).  Nor can PPOA deliberately permit the Department to elicit Ms. Casey's views on PPOA's Stark Law compliance, thereby authorizing Ms. Casey to testify about her mental impressions on whether PPOA was compliant or noncompliant (and any follow-up questions as to why), without deliberately placing this very compliance at issue.  *See, e.g.*, *Barker ex rel. v. Columbus Reg'l Healthcare Sys., Inc.*, No. 4:12-cv-108, 2014 WL 4287744, at *3 (M.D. Ga. Aug. 29, 2014) ("Thus, Columbus Regional injected its belief as to the lawfulness of its conduct into this case and waived its attorney-client privilege as to communications relating to the legality of the transactions that form the basis of Plaintiff's claims.") (citing *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1419 (11th Cir. 1994)); *see also United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) (finding that "testimony that [defendant] thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue" and that "conversations with counsel regarding the legality of his schemes would have been directly relevant to determining the extent of his knowledge").  To the contrary, by intentionally—and selectively—producing documents and permitting the Department to

27

question Ms. Casey about certain communications and compliance matters over which PPOA asserts privilege, and thereby releasing this information into the investigative record, PPOA has, by definition, placed at issue its purportedly privileged material. This necessarily waives any privileges or protections it can assert over undisclosed material of the same subject matter, as the Department must be permitted to consider the disclosed material in context.

*Second*, and to state the obvious, the disclosed communications and information concern the same subject matter that the Department intends to probe during Ms. Casey's CID. PPOA has made imprecise, blanket assertions of privilege over the "modifications of pertinent terms in PPOA employment contracts for medical providers" (Ex. 1 at CID082); "legal language and pertinent terms of contracts" (Ex. 1 at CID086); and "the content of her communications with PPOA officials regarding employment contracts and related issues" (Ex. 1 at CID101). This is the subject matter of the relevant documents that PPOA requested to claw back. *E.g.*, Ex. 1 at CID201. It is the subject matter of the relevant documents that PPOA did *not* seek to claw back. *E.g.*, Ex. 1 at CID041. And it is the subject matter of both the relevant questions that PPOA instructed Ms. Casey not to answer and the relevant questions that PPOA did not. *See supra* ¶ 29; *see also* Ex. 1 at CID097-101 (questions and instructions). Given the nature of PPOA's privilege assertions, and the scope of Ms. Casey's potential answers to questions to which PPOA failed to object, this is not a close call.

*Third*, the material ought in fairness be considered together. Put simply, it is not fair for PPOA to produce some documents and permit some testimony on some issues of compensation, hiring, and compliance that may benefit PPOA, while seeking to withhold documents and testimony on other issues, of the exact same subject matter, that may not. *Cf. Chick-fil-A v. ExxonMobil Corp.*, No. 8-cv-61422, 2009 WL 3763032, at *5 (S.D. Fla. Nov. 10,

2009) (in the context of work-product) ("The Court finds that it would be unfair to permit Exxon to produce work product supporting its contention … while at the same time withholding other Exxon work product documents (if any) that may undermine this contention.").  PPOA cannot fail to "zealously protect[] the information contained in" its documents, or in Ms. Casey's answers to un-objected to examination questions, *Banneker Ventures, LLC v. Graham*, 253 F. Supp. 3d 64, 74 (D.D.C. 2017), and then expect the United States, after relying on the information that PPOA provided, to discard the information and proceed anew with only the information that PPOA would like the Department to have. Moreover, basic fairness dictates that the Department should not be forced to proceed with one arm tied behind its back when deposing Ms. Casey—or any other PPOA employees— about the type of relevant information that PPOA carelessly failed to protect.  *Cf. Doe 1 v. Baylor Univ.*, 320 F.R.D. 430, 439-40 & n.5 (W.D. Tex. 2017) ("[T]he Court asks … 'Would it be fair to allow Baylor to protect the remaining undisclosed details regarding the Pepper Hamilton investigation when it intentionally, publicly, and selectively released certain details of the investigation, including attorney-client communications?'  The Court concludes, with respect to materials covered by the attorney-client privilege, that it would not.").

To be clear, the United States does not seek a waiver that encompasses every communication that PPOA's personnel had on legal issues, or every single instance in which legal advice was arguably rendered (*e.g.*, discussions with outside counsel regarding potential liability under the FCA).  At the same time, and especially in light of the circumstances here, the Department should not be required to question Ms. Casey in a straight-jacket or make investigative and charging decisions based on piecemeal information that PPOA selected for disclosure.  The Department should instead be permitted to use the documents that PPOA

has produced and the information it has permitted Ms. Casey to disclose, and to question Ms. Casey both about that information and about other information that naturally flows from any question that PPOA instructed Ms. Casey not to answer (including questions that implicate information beyond the verbatim text of the documents produced).  This Court has the power to fashion a waiver that is equitable and appropriate in scope, and the United States submits that, in addition to a waiver over the actual information that PPOA has produced and to which PPOA has permitted Ms. Casey to testify, a waiver that generally extends to Ms. Casey's knowledge and involvement in physician hiring and compensation, contract modifications, and related compliance is reasonable and appropriate under the circumstances.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court issue an order compelling Ms. Casey to sit for her CID examination and answer all questions posed by the Department pertaining to the hiring and compensation of physicians, the modifications of contract terms, and issues of legal compliance related to all of the above.

Dated: March 12, 2021                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Acting Assistant Attorney General

                                         KARIN HOPPMANN
                                         Acting United States Attorney
                                         LACY R. HARWELL, JR.
                                         Assistant United States Attorney
                                         Florida Bar No. 714623
                                         LINDSAY SAXE GRIFFIN
                                         Assistant U.S. Attorney
                                         Florida Bar No. 72761

                          By:            /s/ David W. Tyler
                                         JAMIE ANN YAVELBERG
                                         EDWARD CROOKE
                                         DAVID W. TYLER
                                         Attorneys, Civil Division
                                         U.S. Department of Justice
                                         P.O. Box 261, Ben Franklin Station
                                         Washington, D.C. 20044
                                         Tel.: (202) 305-3988
                                         david.w.tyler2@usdoj.gov

                                         *Attorneys for the United States*